Filed 2/1/22  P. v. Rizo CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Yolo)

----

| | |
|---|---|
| THE PEOPLE, | C089325 |
| Plaintiff and Respondent, | (Super. Ct. No. CRF182958) |
| v. | |
| CHRISTIAN RIZO, | |
| Defendant and Appellant. | |

On the night of August 30, 2016, Woodland Police Department officers were dispatched to the Casa del Sol trailer park based on reports of a knife fight and possible stabbing.  The investigation quickly evolved into a homicide investigation involving two members of the Varrio Bosque Norteños criminal street gang.  Later, defendant, also a Varrio Bosque Norteño, was riding in a car on East Street past the trailer park.  One of the officers at the trailer park heard someone yell something like "fuck you nigga cops,"

1

and defendant then fired at least two gunshots at the officers from the car. A jury found defendant guilty of assault with a semiautomatic firearm on a peace officer (four counts), shooting at an inhabited dwelling, and active participation in a criminal street gang. Defendant was sentenced to 15 years to life plus a determinate term of six years eight months.

On appeal, defendant asserts (1) substantial evidence did not support the four convictions of assault with a semiautomatic firearm on a peace officer, (2) the same counts must be reversed for instructional error the trial court committed in responding to a jury note requesting a definition of the term "force," and (3) the judgment must be reversed because the trial court committed evidentiary error in admitting (a) evidence of defendant's prior homicide conviction, (b) a video showing defendant firing a shotgun saying, "Bosque, scrapas," and flashing a gang sign, and (c) a Facebook Messenger text exchange from months prior to the shooting in which defendant was asked what he was doing and he responded, "trying to kill some cops."

Regarding defendant's claim of instructional error, we conclude the trial court should have given the bracketed language of CALCRIM No. 860 defining force instead of the improvised instruction it provided after receiving the jury's note. However, any error in failing to do so, and instructing the jury as it did, was harmless under any standard. Defendant's other contentions are meritless.

We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Defendant was charged with attempted deliberate and premeditated murder (Pen. Code, §§ 664, subd. (a), 187, subd. (a); counts 1-4),[1] assault with a semiautomatic

---

[1] Further undesignated statutory references are to the Penal Code in effect at the time of the charged offenses.

2

firearm upon a peace officer (§ 245, subd. (d)(2); counts 5-8),[2] shooting at an inhabited dwelling (§ 246; count 9), malicious discharge of a firearm from a vehicle at another person other than an occupant of the vehicle (§ 26100, subd. (c); count 10), and active participation in a criminal street gang (§ 186.22, subd. (a); count 11).[3] Counts 5 through 8 included section 186.22, subdivision (b)(1) gang enhancement allegations and count 9 included a section 186.22 subdivision (b)(4) gang enhancement allegation. Counts 5 through 8 alleged defendant personally and intentionally discharged a firearm (§ 12022.53, subd. (c)), and that a principal to a violation of section 186.22, subdivision (b) used a firearm within the meaning of section 12022.53, subdivisions (b) and (e)(1). Count 9 alleged a principal to a violation of section 186.22, subdivision (b) used a firearm within the meaning of section 12022.53, subdivisions (c) and (e)(1).

### Evidence Presented by the Prosecution

### Shots Fired at Woodland Police Officers

At approximately 10:30 p.m. on August 30, 2016, Sergeant Frank Ritter of the Woodland Police Department was dispatched to the Casa del Sol trailer park on East Street. The dispatch indicated there were several individuals fighting, knives were involved, and two people were possibly stabbed. During the course of the night into the early morning hours, the investigation evolved into a homicide investigation. Ritter did not recall whether he arrived with his lights and siren activated, although it would be his typical practice to do so.

---

[2] The alleged victims on counts 1-4 and 5-8 were Corporal Richard Towle, Officer David Shepard, Detective Maribel Cortes, and Sergeant Frank Ritter.

[3] When the jury was unable to reach a verdict on counts 1 through 4 and 10, the trial court declared a mistrial as to those counts. We do not discuss those counts, or the enhancement allegations attached to them, further.

At approximately 1:15 a.m., now August 31, Ritter was standing in full uniform outside of his marked patrol vehicle near the driver's side front tire. Ritter was facing west, in the direction of East Street, which was "a couple hundred feet maybe at the most." To the east of his location, beyond some trees and on the other side of a street, were trailer units.

Ritter "partially saw" a vehicle traveling north on East Street. The vehicle "caught [Ritter's] attention, and [he] was eyeballing it." However, there were obstructions between Ritter and the vehicle, including a building and a chain link fence with diagonal privacy slats. Ritter did not see any other vehicles traveling on East Street. As the vehicle passed an abandoned supermarket, Ritter could "partially see the vehicle," although he could not describe it, discern the make of the car, or see how many people were in it. A male in the vehicle yelled something like, "fuck you nigga cops," and then Ritter heard several gunshots, at least two. He also saw two muzzle flashes. He did not see who fired the gunshots.

The officers in Ritter's vicinity crouched down and Ritter looked around to make sure no one had been shot. Ritter then noticed a bullet hole in his driver's door that had not been there previously. The bullet hole was three to four feet from Ritter's location. Ritter estimated that, at the time of the gunshots, he was approximately 150 feet from East Street. He estimated that Corporal Richard Towle, Detective Maribel Cortes, and Officer David Shepard, who were nearby, ranged in distance from 120 to 150 feet from East Street.

Officer Shepard was standing next to Detective Cortes. Shepard was wearing a shirt that identified him as part of a K-9 team with a vest marked "police" and a badge. At approximately 1:15 a.m., Shepard heard two gunshots coming from the area of East Street. Prior to the shooting, Shepard did not hear a vehicle on East Street and had not heard anyone in the area of East Street say anything. At the time of the shooting, Shepard was standing by Ritter's vehicle, where the front and rear doors meet and

4

approximately five feet from the vehicle. If he had been standing directly next to Ritter's vehicle, he would have been approximately 18 inches from where the bullet struck the vehicle.

Detective Cortes was a patrol officer in full uniform at the time of the shooting. Cortes testified the red and blue overhead lights of Ritter's patrol vehicle were activated at the time. She heard yelling, but she was not able to make out what the speaker said or whether the speaker was male or female. Cortes then heard two gunshots and took cover. Cortes testified that she had been standing approximately six feet from Ritter's vehicle when the shots were fired. If she had she been standing against Ritter's vehicle, she would have been mere inches from where the bullet pierced the vehicle door.

Corporal Towle was in plain clothes at the time, but wore a marked police vest. At approximately 1:15 a.m., Towle heard a male voice yell something. He also saw the taillights of a car traveling north on East Street. He testified that one could see lights through the fence's privacy slats. Towle could not discern anything about the car other than it was a sedan. He then heard two gunshots.

Approximately five minutes after the initial gunshots, Ritter heard more than three additional gunshots. This round of gunshots came from the east, in the direction of the Gum Avenue overpass. Cortes also heard a second round of gunshots coming from the east in the direction of the Gum Avenue overpass, about five minutes after the first round of gunfire. Towle heard three to five shots coming from the direction of the Gum Avenue overpass, and estimated this second round of gunfire occurred eight to 10 minutes after the first round of gunfire.[4]

---

[4] Shepard did not hear the second round of gunshots.

Cortes testified that, to her knowledge, at the time of the gunfire, the stabbing suspect or suspects were not in custody, although they were eventually located in a trailer in the trailer park.

Towle found a bullet inside Ritter's vehicle on the rear driver's side floorboard. Towle believed the bullet to be consistent with a nine-millimeter round.

Tracing the path of the gunfire from Ritter's patrol vehicle towards where he heard the gunshots being fired, Towle located a hole in one of the privacy slats in the fence. He testified that the path, from the patrol vehicle through the hole in the fence slat, was consistent with where he heard gunshots fired from. Based on the bullet trajectory, Towle testified the bullet missed hitting him by "inches or maybe a foot."

Based on his 20 years as a police officer and four years in the military, Ritter testified the gunshots fired that night were consistent with being fired from a semiautomatic firearm.

An overhead diagram of the shooting depicts the trajectory of the shot from East Street to Ritter's patrol vehicle. It traveled from the street, through the fence, over an empty parking space between two parked vehicles, and into Ritter's vehicle in the midst of the greatest concentration of officers in the area.

On September 1, Towle responded to the area of the Gum Avenue overpass after a citizen reported finding cartridge casings. Towle located three expended nine-millimeter cartridge casings.

**A.P.'s Account of the Shooting[5]**

A.P. had known defendant for approximately four years.[6] (1 RT 129, 130) She knew him by the nickname "Kiki," and she knew him to be involved with the Varrio Bosque Norteños, or VBN, gang. A.P. described her relationship with defendant as "like friends with benefits."

One night in August 2016, A.P. was driving her car, a Nissan Maxima sedan, in the area of the Casa del Sol trailer park. Defendant was in the front passenger seat and someone named Prashneet, whose last name she did not know, was in the back seat. A.P. testified defendant did not tell her where to go when they were driving. They were just driving around and happened to pass by Casa del Sol.

As they neared the Casa del Sol, A.P. saw "police lights in the distance, but there was a park in front of it, so we couldn't really see any people." Asked if she saw the overhead lights of a police car, A.P. testified, "The lights. The color. Yeah." While A.P. was stopped at a traffic light, waiting to turn left onto East Street, defendant pulled out a handgun. He turned to A.P. and asked, "should I?" As to her response, A.P. testified: "I go, you won't, in the tone, that expression is kind of like you're daring someone to do it." The traffic light turned green, A.P. turned, and, "as we turned, that's when it happened." A.P. testified defendant fired two or three shots out the passenger window. She testified, however, that she did not actually see defendant shoot the gun, she just heard it. She testified that, as the driver, she "had to keep [her] eyes on the road, as [she] was turning

---

[5] Pursuant to the California Rules of Court, rule 8.90, governing "Privacy in Opinions," we refer to certain witnesses by their initials only.

[6] At the time of trial, A.P. was in custody. She testified pursuant to a plea agreement under which she pleaded no contest to being an accessory after the fact (§ 32) and admitted to a gang enhancement (§ 186.22, subd. (b)(1)). She also agreed to testify truthfully at trial in this case and others. Pursuant to her plea agreement, she would be placed on probation with a suspended five-year prison sentence.

on a main street." A.P. did not recall defendant shouting anything out the window. However, when asked if that is something she would remember, A.P. testified, "Honestly, I probably wouldn't. I have bad memory."

A.P. drove away from the area and eventually took defendant and Prashneet home. A.P. testified defendant did not shoot the gun a second time that night.

**Defendant's Admissions to E.S.**

E.S. previously had been a VBN gang member.[7] According to E.S., to become a member of the gang, one first had to "kick it for awhile," meaning hang out with members of the gang. Then one had to "put in work," meaning fight rivals and commit crimes for the gang. E.S. testified defendant was also a VBN member and that defendant put in work for the gang. E.S. had previously told Detective Pablo Gonzales defendant "was down for anything as it relates to the gang." Defendant "never backed down." "He was always ready." E.S. knew defendant to carry guns often.

E.S. testified that Alexis Velasquez, or "Oso," and Justin Gonzales, or "Bandit," were both VBN members. According to E.S., on the night of August 30 and the morning of August 31, 2016, Velasquez and Gonzales were in the process of being arrested for a homicide. E.S. learned about it on the "Yolo Scanner," which is a "[p]ost on Facebook of incidents that happen." E.S. knew other gang members consulted Yolo Scanner in order to "be aware of what is going on."[8]

---

[7] E.S. also testified pursuant to a plea agreement. E.S. agreed to provide full and truthful testimony in this case and at least two others. Under the agreement, he pled no contest to assault with a deadly weapon (§ 245) and admitted a gang enhancement allegation (§ 186.22, subd. (b)(1)). Under the terms of the agreement, he would serve four years in prison.

[8] Detective Cortes testified the Yolo Scanner was "information that is posted by people about what is going on in Woodland, in the county." She did not know what was on the Yolo Scanner just before the time of the shooting.

E.S. testified he spoke with defendant about the incidents involving Gonzales and Velasquez. According to E.S., a few days after the shooting, defendant told him, "they shot at the cops for a distraction, so Oso and Bandit could getaway [*sic*]." Defendant told him, "They were driving by, and that he shot at the cops, and then went over the bridge and shot again to lead them away." The second shooting occurred "[o]ver the bridge, going over the overpass." The bridge is on East Gum Avenue going over Route 113. Defendant told E.S. he was with A.P. and Prashneet Singh. Singh, according to E.S., was associated with VBN but, at that time, was still just "kicking it" as opposed to being elevated to the stature in the gang where one is "putting in work." Defendant talked to E.S. about this incident "a few times." E.S. also talked to Singh about the shooting.

E.S. testified that, if a gang member were to claim credit for something they did not actually do, it would make that person look bad and lower that person's standing in the gang.

**Defendant's Gang Membership and VBN**

Officer Sergio Pimentel worked as a supervising probation officer for the Yolo County Probation Department. In his role, he previously supervised defendant. Pimentel testified that he seized at least three phones from defendant's bedroom in connection with at least two prior arrests. Pimentel also received a phone from Singh who was a VBN member. Pimentel extracted videos from defendant's and Singh's phones. Five videos were played for the jury. In two videos, defendant and other VBN members were riding in a car, drinking alcoholic beverages. In two videos, defendant was hanging out with other VBN members outside. In the last video (discussed in more detail in part III.D. of the Discussion, *post*), defendant fired a shotgun, said "Bosque scrapas," and made the lowercase "b" hand sign described by Detective Gonzales.

Detective Gonzales testified as an expert on the Varrio Bosque Norteño street gang. Gonzales testified there were no fewer than 30 VBN members. VBN members use hand signs traditional to Norteños such as signaling the number 14 or four. The

9

significance of the number 14 is that it represents N, the 14th letter of the alphabet, for Norteño. VBN members will also display a "B," either uppercase or lowercase. Also, when making the "b," they will sometimes stretch out the pinky finger to form a "V" so as to sign "VB" for "Varrio Bosque." They associate with the color red.

Gonzales agreed with E.S.'s account of how people become VBN members, although he characterized what E.S. said as a "very simplified version of it." According to Gonzales, putting in work can include assaults on rival members, selling drugs, accessing firearms, and selling firearms. Gonzales also testified that one need not be a member of the gang to be an active participant in the gang.

Gonzales testified that Woodland is basically VBN turf and the Four Corners area at Community Lane, West Cross Street, and Cottonwood Street, is a concentrated area for the gang.

The primary activities of VBN, according to Gonzales, were murder, attempted murder, assault with deadly weapons, illegal possession of firearms, illicit drug sales, and property crimes including vandalism, burglary, and robberies.

Gonzales agreed that Alexis Velasquez and Justin Gonzales were both members of, and active participants in, VBN. Gonzales testified Velasquez and Gonzales were arrested for a homicide that occurred on August 30, 2016, and were convicted of that crime as well as gang enhancements.[9]

Gonzales participated in a search of defendant's bedroom in 2017, during which he found two notebooks. Writings in the notebooks contained VBN and Norteño symbols. Writings included: "chasing down you scraps til the day I die. Norteños put it

---

[9] This was relevant both as a VBN predicate offense and because it appears to be undisputed that this was the underlying crime resulting in the police presence at Casa del Sol on August 30-31, 2016. A second predicate offense, which involved defendant, is discussed in part III.C., *post*. Gonzales was involved in both investigations.

down"; "scraps ain't shit, they get knocked to the ground"; "Norte gang banger . . . all day every day. Snitches get sprayed for the shit they say, done be a rata or a bitchass scrapa"; "can't stop, won't stop, I bang that 1-4, throw up here my hood, let these suckas know, fuck a scrap and the 5-0"; "Kiki be the name, if you suckas haven't heard . . . homicide on my mind, don't get yourself murcked"; "any kind of disrespect, and I'll hit em where it hurts. Varrio Bosque be the gang, bitch, we get turnt." Gonzales testified that "Scrap" is a derogatory term for southerners or Sureño gang members, rivals of defendant's gang. "5-0" is a reference to police. "Murcked" is slang for murdered.

Gonzales described defendant's tattoos. Among others, he had "4 CB" tattooed on his left middle finger which stood for Four Corners Block. He had a California bear on one forearm, which "we see that on -- sometimes in Norteño symbology just because it's representing California, Northern California with the northern star." On the other forearm, defendant had an S with a line through it, "which looks like a money sign, but a lot of times in tattoos, in symbols there is multiple meanings, which goes along with the Sureño disrespect within that tattoo." Defendant also had "WDLD" tattooed on his knuckles for Woodland and 530 tattooed on his wrist.

Defendant captioned a video posted on his Facebook page "Fuck the police." There were also photographs of defendant on his Facebook page throwing up gang signs, dressed in gang clothing, and in the company of other gang members.

Gonzales explained the importance of respect in gang culture. Respect is one of the most highly regarded characteristics in gang subculture and it must be earned by doing things. If someone is being disrespected, that person must act or the person's standing in the gang will be diminished. Respect in gang culture is synonymous with fear and intimidation.

Based on the writings, defendant's prior conviction (discussed in part III.C., *post*), his tattoos, the videos, and testimony of witnesses such as E.S., Gonzales opined that, around August 31, 2016, defendant was an active participant in the VBN gang.

11

The prosecutor posed a hypothetical to Gonzales: "if there was a member of the Varrio Bosque Norteño criminal street gang, who had learned that two other members of the Varrio Bosque Norteño criminal street gang were about to be arrested for a murder, and that person, then, as the passenger in a car drove by the scene where the fellow gang members were about to be arrested, shouted something to the effect of, fuck you nigga cops, and shot two shots directly going through a group of four officers, ultimately hitting a police car beneath the letter O in police, would you have an opinion as to whether that crime was done for the benefit of, at the direction of, or in association with VBN?" Gonzales opined that the act would be done for the benefit of and in association with the gang. It would benefit the gang by luring police away so that the VBN murder suspects could possibly get away. It would also benefit the gang by demonstrating gang members' willingness to commit such a crime, "being down for anything." "That's how they maintain respect, that's how they maintain the image of the gang, and the goal is to have that image show power, force, so that they can better control the criminal activities they do, and then also the community they live in." Members of the community will be less likely to contact law enforcement because they will be scared. "So it benefits the gang as a whole in that way." Also, in this hypothetical, the shooter's "stock in the gang itself would rise."

Gonzales testified his opinion would be further reinforced if the hypothetical added the fact that there was another VBN member in the vehicle with the shooter. "Whenever there is multiple gang members during the same incident you get a sort of pack mentality. So any action, the expectation to do something or continue a certain action is strengthened because they're -- they have eyes on them. So, that display of force is always going to be enhanced because of that pack mentality."

12

## Evidence Presented by the Defense

The defense submitted three exhibits, all photographs, into evidence without objection.[10]

## Stipulations

The parties stipulated that all trailer units at the Casa del Sol trailer park behind Ritter's patrol vehicle were rented at the time the shots were fired.

The parties also stipulated that a criminalist determined the bullet found in Ritter's vehicle and the cartridge casings found on the Gum Avenue overpass were *most likely* fired from a Hi-Point nine-millimeter pistol or a Star nine-millimeter pistol, but that the bullet recovered from Ritter's vehicle also could have been fired from a .380-caliber auto pistol manufactured by Lorcin or Bryco. The cartridge casings found on the overpass also could have been fired from a variety of other nine-millimeter firearms.

## Verdicts and Sentence

The jury was unable to reach a verdict on the attempted murder counts, counts one through four, as well as count ten, but found defendant guilty of counts 5 through 8, assault with a semiautomatic firearm on a peace officer (§ 245, subd. (d)(2)) and found true the gang enhancement allegations (§ 186.22, subd. (b)(1)), the firearm enhancement allegations (§ 12022.53, subd. (c)), and the enhancement allegations that a principal to a violation of section 186.22, subdivision (b) used a firearm within the meaning of section 12022.53, subdivisions (b) and (e)(1). The jury found defendant guilty on count 9,

---

[10] The appellate record does not include these exhibits. According to the parties' closing arguments, defense exhibit A was a still photograph from Ritter's patrol vehicle. The photograph apparently showed that the lights on Ritter's vehicle, and perhaps another vehicle, were off. As defense counsel acknowledged and the prosecutor emphasized, the photograph was taken at 12:30, about 45 minutes before the shooting. Defendant on appeal asserts, without record citation, that the photograph was taken at 12:43 a.m. Even if the photograph was taken at 12:43 a.m., a premise not supported by the appellate record, that would still be more than 30 minutes before the shooting.

shooting at an inhabited dwelling (§ 246) and found true the gang enhancement allegation (§ 186.22, subd. (b)(4)), and the enhancement allegation that a principal to a violation of section 186.22, subdivision (b) used a firearm within the meaning of section 12022.53, subdivisions (b) and (e)(1). The jury found defendant guilty on count 11, active participation in a criminal street gang. (§ 186.22, subd. (a).)

The trial court reaffirmed defendant's previously imposed sentence in Yolo County Superior Court case No. CRF175787 and made the sentence imposed in that case the principal term and the sentence on the instant case the subordinate term. In the instant case, the trial court imposed an aggregate term of 15 years to life plus a determinate term of six years eight months, calculated as follows: on count 9, shooting at an inhabited dwelling, 15 years to life (enhanced by the gang enhancement under § 186.22, subd. (b)(4)(B)); six years eight months (one-third the midterm) on the firearm enhancement attached to count 9 under 12022.53, subdivisions (c) and (e)(1); on each of counts 5 through 8, assault with a semiautomatic firearm on a peace officer (§ 245, subd. (d)(2)), the upper term of nine years stayed pursuant to section 654; five-year terms for the section 186.22, subdivision (b)(1)(B) gang enhancements, 20-year terms for the section 12022.53, subdivision (c) firearm enhancements, and 10-year terms for the section 12022.53, subdivision (b), (e)(1) firearm enhancements, all stayed pursuant to section 654; and on count 11, active participation in a criminal street gang, the midterm of two years stayed pursuant to section 654.

## DISCUSSION

I.  **Substantial Evidence — Assault with a Semiautomatic Firearm on a Peace Officer**

### A. Defendant's Contentions

Defendant asserts his four convictions of assault with a semiautomatic firearm on a peace officer (the sentences for which were stayed pursuant to section 654) must be reversed because they are not supported by substantial evidence. Principally, defendant's

14

contentions are that (1) substantial evidence does not support the determination that it was he who fired the shots, and instead it is reasonable to infer it was Singh who fired the shots, (2) substantial evidence does not support the determination that he knew or reasonably should have known the persons assaulted were peace officers, and (3) the testimony of A.P. and E.S. was contradicted and was not reasonable, credible, and of solid value.

## B. Standard of Review

"In reviewing a claim for sufficiency of the evidence, we must determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime . . . beyond a reasonable doubt. We review the entire record in the light most favorable to the judgment below to determine whether it discloses sufficient evidence—that is, evidence that is reasonable, credible, and of solid value—supporting the decision, and not whether the evidence proves guilt beyond a reasonable doubt. [Citation.] We neither reweigh the evidence nor reevaluate the credibility of witnesses. [Citation.] We presume in support of the judgment the existence of every fact the jury reasonably could deduce from the evidence. [Citation.] If the circumstances reasonably justify the findings made by the trier of fact, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding." (*People v. Jennings* (2010) 50 Cal.4th 616, 638-639 (*Jennings*).) In other words, " '[a] reversal for insufficient evidence "is unwarranted unless it appears 'that upon *no hypothesis whatever* is there sufficient substantial evidence to support' " the jury's verdict.' " (*People v. Penunuri* (2018) 5 Cal.5th 126, 142 (*Penunuri*), italics added.)

## C. Elements of Assault with a Semiautomatic Firearm on a Peace Officer

As the jury was instructed here, to prove defendant guilty of assault with a semiautomatic firearm on a peace officer, the prosecution was required to prove: "1. The defendant did an act with a semiautomatic firearm that by its nature would directly

15

and probably result in the application of force to a person; [¶] 2. The defendant did that act willfully; [¶] 3. When the defendant acted, he was aware of facts that would lead a reasonable person to realize that his act by its nature would directly and probably result in the application of force to someone; [¶] 4. When the defendant acted, he had the present ability to apply force with a semiautomatic firearm to a person; [¶] 5. When the defendant acted, the person assaulted was lawfully performing his duties as a peace officer; [¶] AND [¶] 6. When the defendant acted, he knew, or reasonably should have known, that the person assaulted was a peace officer who was performing his duties." (CALCRIM No. 860.)

## D. Analysis

### 1. Defendant Did an Act with a Semiautomatic Firearm that by Its Nature Would Directly and Probably Result in the Application of Force to a Person

#### a. Defendant's Contentions

It is not disputed that *someone* fired at the officers. Defendant notes the prosecution relied on the testimony of A.P. and E.S. to establish it was defendant. Defendant maintains their testimony was not reasonable, credible, or of solid value sufficient to support a verdict. Defendant emphasizes A.P. did not see who fired the shots from her car because she was focused on driving. Defendant further notes that A.P. drove Singh "home near Gum Avenue and dropped him off. [She] then took [defendant] to the Four Corners block. [Citation.] [She] never saw or heard any more shots after the shots she heard in front of the Casa del Sol. Consequently, it can be reasonably inferred that it was Mr. Singh who fired off the rounds on the Gum Avenue overpass, and the shots fired in front of the Casa del Sol, not [defendant]."

As for E.S., defendant asserts his testimony does not withstand scrutiny. E.S. testified he learned from Yolo Scanner on Facebook that two VBN members were being arrested for a homicide. E.S. testified he later talked to defendant about that night, which

16

was when defendant admitted to him that he was the shooter. However, according to defendant, Detective Gonzales searched the Yolo Scanner records and found no such post. Defendant asserts that at the time of the shooting, the suspects were not known and there was no information about them to post on Yolo Scanner. Furthermore, defendant could not have talked to E.S. "a few days after" the shooting as E.S. claimed because defendant had been picked up in a "sweep" by that time.

Defendant also asserts that A.P. contradicted E.S. in that A.S. testified (1) defendant did not direct her where to drive and there were no discussions about the ongoing homicide investigation, and (2) there were no shots fired after the Casa del Sol shooting.

### b. Analysis

A.P. testified she was driving her car in the area of Casa del Sol. Defendant was in the front passenger seat and Singh was in the back seat.[11] Defendant showed her his gun, asked "should I?" and she dared him to shoot. She did testify that she kept her eyes on the road and did not actually see him shoot the gun, she just heard it, but she also said defendant fired two or three shots out the passenger window. A.P. also testified she was wrong in daring defendant and further testified, "I felt like it was my fault that he actually shot out of my car, because I said what I said."

Defendant told E.S., his fellow VBN gang member, that he committed the shooting. Defendant told E.S. he had been with A.P. and Singh. Defendant told E.S. "they shot at the cops for a distraction, so Oso and Bandit could getaway [*sic*]." Oso and Bandit were fellow VBN members Velasquez and Gonzales, who, at the relevant time, were in the process of being arrested for a homicide, and this information was published

---

[11] Defendant states Singh was seated on the passenger side in the back seat. However, A.P.'s testimony on the pages defendant cites was only that Singh was seated "[i]n the back seat."

17

on the Yolo Scanner page on Facebook. Defendant further explained to E.S., "They were driving by, and that he shot at the cops, and then went over the bridge and shot again to lead them away." The second shooting occurred "[o]ver the bridge, going over the overpass." The bridge is on East Gum Avenue going over Route 113. A.P. testified, however, that defendant did not shoot the gun a second time that night.

E.S. testified defendant talked to him about this incident "a few times." E.S. also talked to Singh about the shooting. E.S. knew defendant "was down for anything as it relates to the gang." Defendant "never backed down." "He was always ready." E.S. also knew defendant often carried a gun.

E.S. also testified that, if a gang member were to claim credit for something they did not actually do, it would make that person look bad and lower that person's standing in the gang.

Defendant's writings and social media posts demonstrated his hostility towards the police. And right before the first shooting, Ritter heard a male voice say, "fuck you nigga cops."

Contrary to defendant's contentions, the foregoing constituted substantial evidence that he, rather than Singh, fired shots at the officers. As we have said, in reviewing a claim for sufficiency of the evidence, we "neither reweigh the evidence nor reevaluate the credibility of witnesses." (*Jennings, supra*, 50 Cal.4th at p. 638.) Nor do we resolve conflicts or inconsistencies in the evidence. (*People v. Young* (2005) 34 Cal.4th 1149, 1181 (*Young*).) Indeed, "[t]he testimony of a single witness is sufficient to uphold a judgment even if it is contradicted by other evidence, inconsistent or false as to other portions." (*People v. Wetle* (2019) 43 Cal.App.5th 375, 388.) The testimony of a single witness is sufficient to support a conviction unless it is physically impossible or inherently improbable. (*People v. Brown* (2014) 59 Cal.4th 86, 106; *Young,* at p. 1181.) The testimony of A.P. and E.S. was neither physically impossible nor inherently improbable.

18

The fact that A.P. testified defendant fired the shots but she did not actually see him firing the gun does not undermine her testimony. She affirmatively testified defendant fired the gun. A.P. may have simply been looking at the road rather than at defendant to her right, explaining why she did not see defendant actually discharge his firearm. "We presume in support of the judgment the existence of every fact the jury reasonably could deduce from the evidence." (*Jennings, supra*, 50 Cal.4th at pp. 638-639.) And nothing A.P. testified to would lead to the conclusion that Singh, from the backseat, fired a gun. For example, there was nothing said in the car by Singh prior to the shooting or by Singh or defendant after the shooting that would suggest Singh, not defendant, was the shooter.

As for the Yolo Scanner information, Gonzales asked E.S. how they knew Oso and Bandit were wanted, and E.S. said "everything goes on Facebook, from Scanner Scatter."[12] Acknowledging that source of information is available, Gonzales opined, "that's how [defendant] probably found out." Defense counsel asked Gonzales if he "did a search of all of [*defendant's*] *Facebook postings*." (Italics added.) He testified he did. Defense counsel followed up: "Did you find anything in those postings referencing [Gonzales] and/or [Velasquez] being in any sort of trouble on August 31st of 2016?" Gonzales responded, "[t]he way Facebook works, *I wouldn't know exactly what he's actually looking at.*" (Italics added.) Defense counsel asked, "All right. So I think the answer to the question is, no, you didn't see anything on his Facebook page that references [Gonzales] or [Velasquez] being in trouble on the 30th or 31st of August of 2016?" to which Gonzales responded "No."

However, Gonzales never testified the information about defendant's fellow gang members was not on Yolo Scanner. He described the functioning of "Scanner Chatter"

---

[12] Witnesses referred to Yolo Scanner by different names. However, there is no contention that they are not discussing the same subject.

19

as follows: "People are listening to their scanners, scanner Apps and then they're posting what they're hearing and talking about it." Asked if he knew whether defendant looked at the Yolo Scanner Chatter pages on August 30 or 31, Gonzales testified, "I believe, I just don't know what he was looking at. I can -- I can say that I saw him on the Scanner Chatter on those days, I just don't know the times, and I don't know what he was looking at. It only comes up as what he searched. It didn't come up -- it does not post like this -- that on Facebook." Gonzales testified he did not go to the Scanner Chatter page to see if there had been anything posted about Gonzales and Velasquez being in trouble. Thus, defendant incorrectly asserts that Gonzales "attempted to corroborate [E.S.'s] contention that [defendant] found out about Mr. Gonzalez [*sic*] and Mr. Vasquez on Yolo Scanner on Facebook by searching the Yolo Scanner records[] [citation] . . . [and] found no evidence that any such information was posted on Yolo Scanner on either August 30 or 31, 2016." Gonzales simply did not go to the Yolo Scanner page to see if there had been anything posted about Gonzales and Velasquez being in trouble; nor did he testify that was even possible to do so after the fact. And the absence of information on defendant's Facebook page about Gonzales and Vasquez is not determinative of whether defendant acquired the information at the relevant time from the Yolo Scanner page.

Gonzales testified he did recall seeing in defendant's search history that "he was on Yolo Scanner Scatter during those times." He continued: "I don't know exactly when those came out, but he was active, and from days before and days after on the Yolo Scanner Chatter."

As defendant asserts, A.P. testified that defendant did not direct her where to drive, as one might expect him to if he were seeking to help his fellow gang members who were in danger of being arrested, and if he had learned about that on Yolo Scanner. However, at best, this detail gave rise to a conflict and inconsistency in the evidence which was for the trier of fact to resolve. (See *Young, supra*, 34 Cal.4th at p. 1181.)

20

Additionally, defendant places too much weight on the fact that E.S. testified that defendant admitted to him that he committed the shootings "a few days" after the incident while Gonzales testified defendant had been taken into custody in a sweep "about two days later." The testimony of both witnesses is imprecise. In any event, the fact that E.S. may not have remembered, or specified, exactly how many days later defendant admitted to committing the shooting or that his testimony arguably conflicted with Gonzales's in this regard is a mere evidentiary conflict, and a minor one at that, which was for the trier of fact to resolve.

Similarly, the fact that A.P. testified defendant did not engage in a second round of gunfire likewise presents a conflict and inconsistency in the evidence which was for the trier of fact to resolve. In any event, the conflict is immaterial. The assault with a firearm counts were based on the shots fired from East Street, and, in face of the evidence we have discussed, we cannot say there is "no hypothesis" supporting the jury's determination that defendant committed the shooting on East Street. (See *Penunuri*, *supra*, 5 Cal.5th at p. 142.)

### 2. Defendant Acted Willfully

Discussing this element separately, defendant essentially asserts that because he was not the shooter, there was not substantial evidence he acted willfully. We have rejected defendant's contention that substantial evidence did not support the jury's determination that he was the shooter who fired the shots with a semiautomatic firearm.

### 3. Aware of Facts that Would Lead a Reasonable Person to Realize His Act, By Its Nature, Would Directly and Probably Result in the Application of Force to Someone

Again, defendant asserts here that, because he was not the shooter, this element was not established. His contention is meritless. In any event, at least one bullet came very close to the four officers. Substantial evidence supported the jury's finding on this element.

21

**4. Present Ability to Apply Force with a Semiautomatic Firearm to a Person**

Once again, defendant relies on his position that substantial evidence did not support the conclusion that he was the shooter to undermine this element. As for the nature of the firearm used, Sergeant Ritter testified, based on his 20 years as a police officer and four years in the military, that the gunshots fired that night were consistent with being fired from a semiautomatic firearm. (Substantial evidence supported the jury's finding on this element.)

**5. The Person Assaulted Was Lawfully Performing His Duties as a Peace Officer**

Defendant concedes the officers were lawfully performing their duties as peace officers at the relevant times.

**6. Defendant Knew or Reasonably Should Have Known the Person Assaulted Was a Peace Officer Performing His or Her Duties**

Defendant asserts that substantial evidence does not support the conclusion that he knew, or reasonably should have known, peace officers were in the trailer park side of the fence bordering East Street. Defendant asserts A.P. did not testify she saw the lights of a patrol vehicle, that she saw a patrol vehicle, or that she saw officers on the trailer park side of the fence on East Street. Defendant also emphasizes the lighting was dark and views were obstructed by a building and a fence with privacy slats as established by the testimony of Sergeant Ritter, Officer Shepard, and Corporal Towle. Accordingly, defendant maintains substantial evidence did not support the determination that he knew or reasonably should have known that the persons assaulted were peace officers performing their duties.

At the relevant time, Ritter and the other officers were in the vicinity of Ritter's marked patrol vehicle which was no more than 200 feet from East Street. They were all either in uniform or wore marked police vests. According to Detective Cortes, the overhead lights of Ritter's patrol vehicle were activated at the time. According to Ritter,

22

immediately before the gunfire, he heard someone yell something like "fuck you nigga cops."

Although there were obstructions, Ritter was able to at least partially see the vehicle traveling on East Street and Towle was able to see taillights through the fence's privacy slats and could tell that the car was a sedan, as was A.P.'s Nissan Maxima. The jury could reasonably infer that, if the officers could partially see the vehicle, make out that it was a sedan, and see its taillights through the fence and its privacy slats, the occupants of the sedan could likewise see police lights on the other side of the fence. Moreover, the jury could reasonably determine that defendant knew from sight, or reasonably should have known, that officers were performing their duties in the vicinity of the police vehicle with its overhead lights activated.

People's exhibit 1, an overhead diagram of the shooting, depicts the trajectory of the shot from East Street to Ritter's patrol vehicle. It traveled from the street, over an empty parking space between two parked vehicles, and into Ritter's vehicle in the midst of the greatest concentration of officers in the area. From this evidence, a reasonable jury could infer the officers were specifically targeted.

For her part, A.P. actually testified that, as they neared the Casa del Sol, she saw "police lights in the distance, but there was a park in front of it, so we couldn't really see any people." Asked if she saw the overhead lights of a police car, A.P. testified, "The lights. The color. Yeah." That was when defendant took out a handgun and asked A.P. whether he should. Defendant incorrectly asserts that A.P. did not testify she saw the lights of a patrol vehicle.

According to E.S., defendant told him "he shot at the cops."

The evidence discussed immediately above constitutes substantial evidence that, when defendant acted, he knew or reasonably should have known the persons assaulted were peace officers performing their duties.

23

### 7. Conclusion

We conclude substantial evidence supports the jury's verdict finding defendant guilty on counts 5 through 8 for assault with a semiautomatic firearm on a peace officer. (§ 245, subd. (d)(2).)  We cannot say that " ' " 'upon *no hypothesis whatever* is there sufficient substantial evidence to support' " the jury's verdict.' " (*Penunuri, supra,* 5 Cal.5th at p. 142, italics added.)

## II.  Instructional Error

### A.  Additional Background

The trial court instructed the jury with CALCRIM No. 860 as set forth partially in part I.C. of the Discussion, *ante*.

On the second day of deliberations, the jury submitted a note to the court stating: "With respect to #2 of Count #10 'The defendant shot the firearm at another person who was not in a motor vehicle.'  [¶]  Can we interpret the word 'at' to be synonymous with the word 'toward'?"[13]

The trial court responded as follows:  "As noted in CALCRIM 200, there are some words in the jury instructions that have legal meanings.  Those words are specifically defined in the jury instructions.  Other words, not specifically defined in the jury instructions, are to be given their ordinary, everyday meanings.  The word 'at' is not a specifically defined word.  Accordingly, the jury should interpret the meaning of the word 'at' in the context of the jury instruction, using that word's ordinary everyday meaning."

---

[13] Count 10 of the third amended information charged defendant with willfully and maliciously discharging a firearm from a motor vehicle at another person other than an occupant of the motor vehicle.  (§ 26100, subd. (c).)  CALCRIM No. 968 instructed the jury, in pertinent part, that to find defendant guilty on count 10, the prosecution had to prove "1.  The defendant willfully and maliciously shot a firearm from a motor vehicle; [¶]  AND  [¶]  2.  The defendant shot the firearm at another person who was not in a motor vehicle."

24

Later in the day, the jury submitted another note: "In relation to Counts 5-8, can you define 'force', please?"

The trial court responded as follows: "In the context of the evidence presented in this case, the 'force' alleged by the People in Counts 5 - 8 is the force exerted by a cartridge fired from a semiautomatic firearm."

Defense counsel noted the following objection on the record, which had previously been made off the record: "The jury asked two questions regarding defining words. In the first question they asked us to define the word 'at' in relation to shooting at an inhabited dwelling, [sic] and the Court just referred them back to the general instruction about to use their every day meanings, if they're not otherwise defined in the instructions. [¶] About an hour or so later, maybe a little longer, we got another note from the jury asking that the Court define the word 'force', and my request was to simply respond the same way that it did when it responded to the definition of the word 'at'. [¶] It is my belief that the Court's instruction tends to bolster what the People were arguing and was improper, and that was my objection."

After the prosecutor stated he believed the Court's response was factually and legally correct, defense counsel continued: "My position essentially was that the Court was crafting an instruction that tailored to the evidence in this case. [¶] My argument was, that's not the Court's role, it is simply just to give the law and not to taylor [sic] the law specific to the facts, and I think the Court's instruction did that."

The court responded: "The first question referenced by the jury asked the Court to interpret the word 'at', and the Court did not interpret the word 'at'. [¶] The Court instructed the jury that if a word is not defined it should be applied using its ordinary every day meaning. [¶] The second question asked the Court to define the word 'force', and as used in this question, it was the Court's belief the jury was not asking the Court to actually define the word 'force', but more to put it in context. [¶] There is only one force used in this case. I don't think there is any dispute that the one and only force alleged in

25

this case was the firing of a bullet from a gun. There is no other force. It is not a situation where someone is accused of slapping a person, pushing a person, punching a person, this case has only one force alleged, and so what the Court said in response to that question was, in the context of the evidence presented in this case, the force alleged by the People in Counts 5 through 8 is the force excerpted [*sic*] by a cartridge fired from the semiautomatic firearm. [¶] And your objection is noted."

## B. Defendant's Contentions

Defendant asserts his convictions for assault with a semiautomatic firearm on a peace officer must be reversed because the trial court committed prejudicial instructional error. Defendant's only substantive argument as to how the trial court's instruction was error appears in the penultimate paragraph of his discussion of the point. In that paragraph, defendant states: "[Defendant] submits that the instruction given with regards to the term 'force' was improper, favored the prosecution, and should not have been given. It was not the trial court's role to tailor the law specific to the facts of the case as it did here. The effect of the proposed response was to bolster the People's argument, lessened its burden of proof and contributed to the verdict of guilty as to the affected counts. This was in error, which cannot be deemed harmless."

## C. Standard of Review

" ' "It is settled that in criminal cases, even in the absence of a request, the trial court must instruct on the general principles of law relevant to the issues raised by the evidence. [Citations.] The general principles of law governing the case are those principles closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case." ' " (*People v. Breverman* (1998) 19 Cal.4th 142, 154.)

"The court has a primary duty to help the jury understand the legal principles it is asked to apply." (*People v. Beardslee* (1991) 53 Cal.3d 68, 97.) With regard to questions arising after deliberations commence, section 1138 provides: "After the jury

26

have retired for deliberation, if there be any disagreement between them as to the testimony, or if they desire to be informed on any point of law arising in the case, they must require the officer to conduct them into court. Upon being brought into court, the information required must be given in the presence of, or after notice to, the prosecuting attorney, and the defendant or his counsel, or after they have been called." "However, '[w]here the original instructions are themselves full and complete, the court has discretion under section 1138 to determine what additional explanations are sufficient to satisfy the jury's request for information.' " (*People v. Brooks* (2017) 3 Cal.5th 1, 97, quoting *Beardslee*, at p. 97.)

"An appellate court applies the abuse of discretion standard of review to any decision by a trial court to instruct, or not to instruct, in its exercise of its supervision over a deliberating jury." (*People v. Waidla* (2000) 22 Cal.4th 690, 745-746.) If the trial court elects to further instruct the jury, "[t]he independent or de novo standard of review is applicable in assessing whether instructions correctly state the law." (*People v. Posey* (2004) 32 Cal.4th 193, 218; *People v. Franklin* (2018) 21 Cal.App.5th 881, 887 & fn. 4.)

## D. Analysis

There is bracketed language in CALCRIM No. 860 defining "force." Two bracketed paragraphs of this instruction state: "[The terms *application of force* and *apply force* mean to touch in a harmful or offensive manner. The slightest touching can be enough if it is done in a rude or angry way. Making contact with another person, including through his or her clothing, is enough. The touching does not have to cause pain or injury of any kind.] [¶] [The touching can be done indirectly by causing an object [or someone else] to touch the other person.]" (CALCRIM No. 860.)[14] The

---

[14] CALCRIM No. 860 provides the following additional bracketed language: "[The People are not required to prove that the defendant actually touched someone]" and "[No one needs to actually have been injured by defendant's act. . .]"

27

parties and the court apparently overlooked this bracketed language. Since the trial court did not give the bracketed part of the instruction as part of the CALCRIM No. 860 instruction, it should have done so upon receiving the jury's inquiry.

The Attorney General responds to defendant's contentions by asserting that the trial court's answer to the jury was proper. The Attorney General relies on *People v. Nieto Benitez* (1992) 4 Cal.4th 91 (*Nieto Benitez*). In *Nieto Benitez*, the jury asked the trial court to define "intentional act" as that term is used in CALJIC No. 8.31, the CALJIC instruction on implied malice second degree murder. (*Nieto Benitez*, at p. 105.) The trial court responded by instructing the jury: " 'The word "intentional" as it is used in CALJIC [No.] 8.31 has no special or unique legal meaning and should be construed as it would be in everyday language. The word "act" as it is used in CALJIC [No.] 8.31 refers to an act from which death in fact results. *In the instant case the pulling of a handgun in the manner described and/or the shooting of the handgun in the manner described are possible acts for your consideration. There may be others*. Whether any such act occurred and whether any such act otherwise meets the requirements of CALJIC [No.] 8.31 is a matter solely for your determination based on the evidence. [¶] *Please do not construe this proposed explanation of an intentional act to be a comment by the Court on the evidence or a suggestion by the Court on what you should find to be the facts. Please remember that you are the exclusive judges of the facts and you may disregard any or all of my comments if they do not coincide with your views of the evidence*.' " (*Id*. at pp. 100-101, italics added.)

Our high court concluded that the trial court's response was proper. (*Nieto Benitez, supra,* 4 Cal.4th at p. 111.) Among other things, the court concluded: "The court's response did not misdirect the jury or relieve the prosecution of its burden of proving that defendant acted with malice." (*Id*. at p. 112, fn. omitted.) Additionally, the court rejected the defendant's contention that the trial court's response was improperly argumentative, "because *the court's response did not imply a conclusion to be drawn*

28

*from the evidence.* [Citation.] Rather, in its response, the court admonished the jury not to view the court's explanation of the phrase 'intentional act' as 'a comment . . . on the evidence or a suggestion by the court on what you should find to be the facts.' The court's response mirrored the earlier, standard instruction which it gave: 'Whether some instructions will apply will depend on what you find to be the facts. . . . Do not conclude that because an instruction has been given that I [am] expressing an opinion as to the facts.' " (*Ibid.*, fn. 9, italics added.)

Unlike in *Nieto Benitez*, here, the trial court's response to the jury implied a conclusion to be drawn from the evidence — "In the context of the evidence presented in this case, the 'force' alleged by the People in Counts 5 - 8 is the force exerted by a cartridge fired from a semiautomatic firearm." In our view, the instruction was argumentative in that it essentially told the jury that the force element had been established based on the evidence that a gun had been fired. Moreover, although the trial court instructed the jury as part of its original final instructions that "[s]ome of these instructions may not apply, depending on your findings about the facts of the case" and "do not assume just because I give a particular instruction that I am suggesting anything about the facts," unlike in *Nieto Benitez*, the trial court did not reiterate these principles in its response to the jury. However, as we shall next discuss, the error was harmless under any standard.

### E. Prejudice

We review an argumentative instruction for harmless error under *People v. Watson* (1956) 46 Cal.2d 818, 836. (*People v. Santana* (2013) 56 Cal.4th 999, 1012.) Under *Watson*, we determine whether it is reasonably probable that, but for the error, the jury would have reached a result more favorable to defendant. (*Watson*, at pp. 835-836.)

Defendant asserts, however, that the trial court's erroneous instruction lightened the prosecution's burden of proof and denied him his right to a properly instructed jury in violation of his Sixth Amendment right to a jury trial and the due process clause of the

Fourteenth Amendment to the United States Constitution. As such, defendant asserts prejudice must be assessed under *Chapman v. California* (1967) 386 U.S. 18 [17 L.Ed.2d 705] (*Chapman*).

Since *Chapman*, our high court has " 'repeatedly reaffirmed the principle that an otherwise valid conviction should not be set aside if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt.' " (*People v. Geier* (2007) 41 Cal.4th 555, 608 (*Geier*); accord, *People v. Aledamat* (2019) 8 Cal.5th 1, 3 (*Aledamat*).) Under *Chapman*, " '[t]he reviewing court must reverse the conviction unless, after examining the entire cause, including the evidence, and considering all relevant circumstances, it determines the error was harmless beyond a reasonable doubt." (*Aledamat,* at p. 3 .) Under *Chapman*, the People must show "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." (*Chapman*, at p. 24; *Aledamat*, at pp. 12-13.) " 'To say that an error did not contribute to the ensuing verdict is . . . to find that error unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record.' " (*People v. Neal* (2003) 31 Cal.4th 63, 86.) In other words, the *Chapman* harmless error inquiry asks: " 'Is it clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error?' " (*Geier,* at p. 608; accord, *People v. Livingston* (2012) 53 Cal.4th 1145, 1159 (*Livingston*).)

We have addressed the substantial evidence supporting these convictions at length in part I.D. of the Discussion, *ante*. We need not marshal the evidence further here. We simply note that, against this backdrop, any error in the trial court's responsive instruction to the jury on "force" was harmless beyond a reasonable doubt. There was no other theory of force applicable in this case. As the Attorney General asserts, the result in this case in no way turned on the applicable definition of force, but on whether defendant was the shooter, and, if he was, what his knowledge and intent were at the time. Defendant does not himself undertake any substantive prejudice analysis beyond the

30

quoted passage in part II.B., *ante*. The trial court's instruction—"In the context of the evidence presented in this case, the 'force' alleged by the People in Counts 5 - 8 is the force exerted by a cartridge fired from a semiautomatic firearm"—was harmless beyond a reasonable doubt. It is clear, beyond a reasonable doubt, that a rational jury would have found the defendant guilty absent any error in the trial court's responsive instruction to the jury. (*Livingston, supra*, 53 Cal.4th at p. 1159; *Geier, supra*, 41 Cal.4th at p. 608.)

## III. Evidentiary Rulings

### A. Defendant's Contentions

Defendant raises three claims of evidentiary error which, he asserts, were prejudicial warranting reversal. He asserts the trial court erred in admitting (1) Gonzales's testimony concerning defendant's prior homicide conviction, (2) the video showing defendant firing a shotgun, and (3) a Facebook Messenger conversation from January 2016 in which, when asked what he was doing, defendant replied, " 'trying to kill some cops.' "

### B. General Principles Concerning the Admission of Evidence

"No evidence is admissible except relevant evidence." (Evid. Code, § 350.) " 'Relevant evidence' means evidence, . . . having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.)

Evidence Code section 352 provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

"Evidence is not inadmissible under [Evidence Code] section 352 unless the probative value is 'substantially' outweighed by the probability of a 'substantial danger' of undue prejudice or other statutory counterweights. Our high court has emphasized the word 'substantial' in [Evidence Code] section 352. [Citations.] [¶] Trial courts enjoy

31

' "broad discretion" ' in deciding whether the probability of a substantial danger of prejudice substantially outweighs probative value.  [Citations.]  A trial court's exercise of discretion 'will not be disturbed except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' "  (*People v. Holford* (2012) 203 Cal.App.4th 155, 167-168 (*Holford*).)

### C.  Evidence of Defendant's Prior Homicide Conviction

Defendant objected before the trial court, on Evidence Code section 352 grounds, to the admission of evidence concerning his involvement in and conviction of a 2016 homicide.  The prosecutor stated he intended to use the evidence as a predicate offense (see § 186.22, subd. (e)), and asserted there was a California Supreme Court case directly on point authorizing the admission of a defendant's own conviction as a predicate offense.  Defense counsel reiterated his objection was pursuant to Evidence Code section 352 and offered to stipulate that the predicate offenses had been established.  The prosecutor indicated he was not willing to accept a defense stipulation that VBN was a criminal street gang.  The court concluded that it was "a close call," but ultimately decided "the law allows you to do it, so let's try to sanitize it as much as we can."  The court overruled the objection, but further stated:  "I have concerns about it, and I will be very frank, . . . it may poison your -- well, if there is a conviction on appeal."

Gonzales testified as follows:

"Q      Finally, briefly, are you aware of a case in which [defendant] was arrested in June of 2016 for a homicide?

"A      [Defendant] was arrested for that in September of 2017, but, yes, I am aware of a crime in June that he committed, yes.

"Q      And to your knowledge, was he convicted in that case?

"A      Yes, he was.

32

"Q      And as part of that case, were gang enhancement allegations found to be sustained or true?

"A      Yes."

Defendant asserts the trial court abused its discretion in admitting this evidence, stating:  "the Court recognized the clear danger in allowing the prosecution to present such evidence and that by doing so any conviction thereon would be compromised and subject to reversal."

The evidence was relevant.  While defendant did offer to stipulate the predicates had been established and that VBN was a criminal street gang, "the prosecution was not required to accept defense concessions as a sanitized alternative to the full presentation of its case."  (*People v. Zambrano* (2007) 41 Cal.4th 1082, 1149, disapproved on other grounds by *People v. Doolin* (2009) 45 Cal.4th 390.)  Nor is "the prosecution . . . required to accept a stipulation that would deprive its case of its effectiveness, or to present its case in the manner preferred by the defense."  (*People v. Salcido* (2008) 44 Cal.4th 93, 150.)

Moreover, defendant's prior homicide conviction was relevant not merely as a predicate offense.  It was also relevant to prove other elements of the gang enhancement allegations and thus had additional probative value.  Aside from being a predicate offense and an example of one of VBN's primary activities, the prior conviction had a tendency to prove that defendant committed the crimes charged here "for the benefit of, at the direction of, or in association with criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members."  (§ 186.22, subd. (b)(1).)  This evidence was also relevant to count 11, active participation in a criminal street gang (§ 186.22, subd. (a)), including the second element of that offense: " 'knowledge that [the gang's] members engage in or have engaged in a pattern of criminal gang activity' "  (*People v. Lamas* (2007) 42 Cal.4th 516, 523, quoting § 186.22, subd. (a)).  Defendant's willingness to stipulate to qualifying predicate offenses or that

VBN was a criminal street gang would not have freed the prosecution from the requirement that it prove all elements of the gang enhancement allegations and count 11.

As defendant made clear before the trial court, his objection was pursuant to Evidence Code section 352. However, it is clear that the foregoing exchange did not result in the undue consumption of time. (Evid. Code, § 352.) Nor is there any suggestion on this record that this exchange resulted in confusing the issues or misleading the jury. (*Ibid*.)

With regard to *undue* prejudice, " ' "[t]he prejudice which exclusion of evidence under Evidence Code section 352 is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence. '[A]ll evidence which tends to prove guilt is prejudicial or damaging to the defendant's case. The stronger the evidence, the more it is "prejudicial." The "prejudice" referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual *and which has very little effect on the issues*.' " ' " (*Holford, supra*, 203 Cal.App.4th at p. 167 [approving of the admission of the entirety of a child pornography movie instead of a sanitized version because the movie was the evidence establishing the offense].) And as we have noted, the probative value must be "substantially" outweighed by the probability of a "substantial danger" of undue prejudicial before the evidence is deemed inadmissible under Evidence Code section 352. (*Ibid*.) As addressed *ante*, this evidence was relevant to a number of issues to be determined by the jury and thus had added probative value as to the mens rea elements of the gang enhancement and the substantive gang offense.

Moreover, this is not a case where the jury might be tempted to punish defendant for a prior offense for which he escaped punishment even if it did not consider him guilty of the charged offenses; he was convicted of the prior offense. (See *People v. Ewoldt* (1994) 7 Cal.4th 380, 405.)

34

Thus, the probative value of this evidence was not substantially outweighed by the probability that its admission would create a substantial danger of undue prejudice. The trial court did not abuse its discretion in admitting evidence of defendant's prior homicide conviction.

### D. The "Shotgun Video"

Defendant objected to the admission of the "shotgun video" extracted from a cell phone which depicted defendant firing a shotgun. Defendant's objection was based on Evidence Code section 352. Defendant asserted that, "given the nature of the charges in this case and given that the video clip showed him firing a gun, it would be unduly prejudicial to" him. The court allowed the video to be played for the jury. The court later explained that it did so because it saw the issue in this case less whether defendant a fired a gun and more what his intent was. The court also found that, while the video had "some prejudicial impact," it was less prejudicial than the court had anticipated and determined that its prejudicial effect did not substantially outweigh its probative value.

On appeal, while defendant asserts the admission of the video was error, he does not offer substantive analysis in support of his contention. Instead, he merely recites the background, including his objection before the trial court and the trial court's ruling. He offers no analysis of the issue, nor any citation to authority supporting his position.

" ' "A judgment or order of the lower court is *presumed correct*. All intendments and presumptions are indulged to support it on matters as to which the record is silent, and error must be affirmatively shown. This is not only a general principle of appellate practice but an ingredient of the constitutional doctrine of reversible error." ' " (*People v. Leonard* (2014) 228 Cal.App.4th 465, 478, quoting *Denham v. Superior Court of Los Angeles* (1970) 2 Cal.3d 557, 564.) "It is the appellant's burden to demonstrate the existence of reversible error." (*Del Real v. City of Riverside* (2002) 95 Cal.App.4th 761, 766.) "To demonstrate error, appellant must present meaningful legal analysis supported by citations to authority and citations to facts in the record that support the claim of error.

[Citations.] When a point is asserted without argument and authority for the proposition, 'it is deemed to be without foundation and requires no discussion by the reviewing court.' [Citations.] Hence, conclusory claims of error will fail." (*In re S.C.* (2006) 138 Cal.App.4th 396, 408.) Additionally, an appellant has the burden of demonstrating error *and resulting prejudice*. (See, e.g., *People v. Coley* (1997) 52 Cal.App.4th 964, 972; see also Cal. Const., art. VI., § 13 ["No judgment shall be set aside, or new trial granted, in any cause, on the ground of misdirection of the jury, or of the improper admission or rejection of evidence, or for any error as to any matter of pleading, or for any error as to any matter of procedure, unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice"].)

In any event, this evidence was relevant and tended to prove defendant's *active participation* in VBN, and was also relevant as an example of one of the primary activities of his gang, prohibited possession of firearms. Firing the weapon and then yelling out a derogatory term for a rival gang and flashing his gang's hand sign was also relevant to show defendant's specific intent to promote, further, or assist in any criminal conduct by gang members. Thus, the video was highly probative, and we conclude the trial court did not abuse its discretion in concluding that probative value was not substantially outweighed by any prejudicial effect.

### E. January 2016 Facebook Messenger Conversation

Based on Evidence Code section 352, defendant objected to the admission of a Facebook Messenger conversation from January 2016, in which, when asked what he was doing, he stated he was "trying to kill some cops." Among other things, defense counsel emphasized this conversation took place approximately eight months before the shooting at issue here. The prosecution responded that "it goes to the heart of the issue here," as to defendant's intent. The prosecutor conceded the evidence was prejudicial, but further asserted its prejudicial effect did not outweigh its probative value. The court indicated it

intended to consider the matter further. There is no ruling on the matter in the record and the evidence was admitted.

The Facebook Messenger exchange was between defendant and someone who was, at the time, an active participant in VBN. That person sent defendant a message asking defendant what he was doing. Defendant responded: "trying to kill some cops."

Again, defendant's argument offers no meaningful legal analysis. Other than reciting the procedural background, defendant simply asserts, "such admission was an abuse of discretion." Defendant cites three cases which, insofar as pertinent here, stand only for the proposition that the abuse of discretion standard of review applies to a trial court's ruling on an Evidence Code section 352 objection. (*People v. Gordon* (1990) 50 Cal.3d 1223, 1239, disapproved on another ground in *People v. Edwards* (1991) 54 Cal.3d 787, 835-836; *People v. Karis* (1988) 46 Cal.3d 612, 637; *People v. Stewart* (1985) 171 Cal.App.3d 59, 65.)

In any event, the evidence was highly probative of defendant's motive in that it reflected his hatred for the police. And because defendant had been charged with attempted murder, it also tended to show his intent when he fired his gun at the police.

The trial court did not abuse its discretion in admitting this evidence.

**\*\*\*\*\***

**DISPOSITION**

The judgment is affirmed.

                                                      /s/
                                       MURRAY, J.[15][*]

We concur:

/s/
HOCH, J., Acting P. J.

/s/
KRAUSE, J.

---

[*] Retired Associate Justice of the Court of Appeal, Third Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.